UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-MJ-02973-TORRES

UNITED STATES OF AMERICA

vs.

ENRIQUE IGLESIAS,

        Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

        Respectfully submitted,

        BENJAMIN GREENBERG
        UNITED STATES ATTORNEY

BY: *[signature]*
        MICHAEL N. BERGER
        ASSISTANT UNITED STATES ATTORNEY
        Court No.: A5501557
        99 N. E. 4th Street
        Miami, Florida 33132-2111
        TEL (305) 961-9445

        *[signature]*
        YISEL VALDES
        DOJ TRIAL ATTORNEY
        Court No.: A5502330
        1400 New York Avenue NW
        Washington, DC 20005
        TEL: (202) 330-1822

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>ENRIQUE IGLESIAS,<br><br>_Defendant(s)_ | )<br>)<br>)  Case No.  18-MJ-02973-TORRES<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2013 - 2015__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |
| 18 U.S.C. § 1956(a) | Money Laundering |
| 31 U.S.C. § 5324 | Structuring Transactions to Avoid Reporting Requirements |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Jose Subias, FBI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __06/22/2018__

_____
_Judge's signature_

City and state: __Miami, Florida__     U.S. Magistrate Judge Edwin G. Torres
_Printed name and title_

## Affidavit in Support of Complaint

I, Jose Subias, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") Miami Field Office and have been employed in this capacity for twenty-two years. I am also a Certified Public Accountant. I have been involved in numerous investigations involving health care fraud and money laundering.

2. This affidavit is submitted in support of a criminal complaint charging the defendant Enrique Iglesias with violations of Title 18 United States Code Sections 1956(a) (money laundering) and (h) (conspiracy to commit money laundering) and Title 31, United States Code, Section 5324 (structuring transactions to avoid reporting requirements).

3. The facts contained within this affidavit are both personally known by me, as well as relayed to me by others, including members of law enforcement and other witnesses. This affidavit sets forth only those facts that I believe are necessary to establish probable cause. As such, I have not included each and every fact known about this investigation.

## Background

4. Convenient Check Cashing Corporation ("Convenient") was a check-cashing store located at 3817 West Flagler Street in Miami, Florida. Convenient listed the defendant's mother as the president of Convenient in the Florida Division of Corporations database. Convenient maintained bank accounts for its check cashing operations at People's Credit Union (Broward County) and Merchants Bank of California.

5. Total Check Solutions Corporation ("Total") was a check-cashing store located at 198 E. 4th Avenue in Hialeah, Florida. Total listed M.C. as the president of Total in the Florida

1

Division of Corporations database. Total maintained bank accounts for its check cashing operations at People's Credit Union (Broward County) and CommerceWest Bank in California.

## Overview

6. From at least as early as 2013, continuing to in or around 2015, the defendant agreed with others to knowingly launder the proceeds of health care fraud, mortgage fraud, and other fraudulent activity through Convenient, Total, and elsewhere in the following manner:

- Persons committing healthcare and mortgage fraud held proceeds from their fraud in bank accounts—typically in the name of nominee owners. These scammers worked with the defendant to convert their funds to cash.

- The defendant directed the scammers on how to convert the fraudulently obtained funds into cash at defendant's stores. The defendant directed the scammers to keep checks under $10,000 and to spread the checks out over time. The defendant knowingly accepted checks from the scammers made out in the name of nominees, often in the names of individuals that had fled the country at the direction of the scammers.[1]

- Typically, the scammers brought a bundle of checks and provided them to the defendant outside the store or through the back area of the store. Because the defendant knew the checks came from fraud, the defendant charged an additional percentage as his personal fee in addition to the fee charged by the store. This fee varied from five to fifteen percent for healthcare fraud checks and fifteen percent for mortgage fraud checks.

7. During the relevant period, Convenient and Total cashed over $150 million in checks and, based on a review, a majority of the checks appear to come from healthcare fraud, mortgage fraud, and other fraudulent activity.[2]

---

[1] The United States has done an analysis showing numerous instances where the defendant cashed checks in the names of individuals who were not in the country on the dates when the checks were cashed.

[2] As for other fraudulent activity, many of the checks cashed by Total and Convenient come from companies that appear to be in the construction industry. For example, there are repeat checks from the same companies with drywall or plastering in their name often for large sums (e.g., each over $40,000). In South Florida, it is common practice for construction companies and subcontractors to pay workers through shell companies in order to hire undocumented workers and avoid paying workers compensation. This activity, although prevalent at the store, is not detailed in this affidavit.

2

**The Defendant Knowingly Cashed Health Care Fraud Checks at Convenient**

8. The defendant had operational responsibility for Convenient at least as early as 2013. The records for Convenient show approximately $96 million in checks cashed during the period from 2013 to 2015. Numerous confidential witnesses have explained the *modus operandi* that the defendant used to launder healthcare fraud proceeds.

Healthcare Fraud Laundering– Confidential Witness 1 ("CW1")

9. CW1 is an individual convicted of conspiracy to commit health care fraud in 2016. CW1 agreed in a factual proffer that he/she had (a) acquired home health agencies ("HHA") through a nominee owner; (b) caused the HHAs to ramp up fraudulent billing on Medicare for patients for services not provided or not needed; and (c) laundered millions of dollars in Medicare claim payments from the HHA bank accounts through shell companies.

10. CW1 explained that he/she met with the defendant because he/she had problems obtaining cash from accounts at banks in the names of his/her HHAs. The defendant instructed CW1 on how to cash CW1's fraudulent checks through the defendant's store. For example, the defendant instructed CW1 to keep the checks below $10,000 and to make the checks payable to different shell companies to receive the proceeds.

11. Based on the defendant's instructions, CW1 set up numerous different shell companies in the names of nominee owners. Each nominee would go to Convenient on one occasion to register at the store. CW1 would then write out checks from the HHAs payable to shell companies. CW1 would typically bring about $80,000 in checks per week payable to different shell companies to the Defendant at the back of the store.

12. The bank records of Convenient show over $5 million in checks cashed at Convenient from CW1's HHAs to shell companies from 2013 through 2014:

3

- *Ariamni Home Health Corporation*: 152 checks written to shell corporations for a total of approximately $1.3 million.

- *Brothers Home Health Care Inc*: 29 checks written to shell corporations for a total of approximately $540,000.

- *Care First Home Health Corporation*: 184 checks written to shell corporations for a total of approximately $1.8 million.

- *Prestige Home Health Care*: 113 checks written to shell corporations for a total of approximately $1.5 million.

- *Ventus Home Health*: 55 checks written to shell corporations for a total of approximately $540,000.

13. CW1 explained that Defendant charged between 7% and 11% as Defendant' fee for cashing these fraudulent checks. CW1 said that Defendant later sought to charge a fee up to 15% for cashing these fraudulent checks.

14. CW1 explained that the defendant knew the proceeds came from health care fraud and even discussed the different expenses associated with CW1's health care fraud business, including paying patients.

Healthcare Fraud Laundering – Confidential Witness 2 ("CW2")

15. CW2 is an individual convicted of health care fraud in 2014. CW2 agreed in a factual proffer that he/she had (a) acquired, with his/her co-conspirator, a pharmacy through a nominee owner; (b) caused the pharmacy to bill Medicare for fraudulent Medicare claims; (c) caused Medicare to make approximately $2.8 million in overpayments to CW2 and his/her co-conspirator; and (d) laundered money obtained from the Medicare fraud scheme.

16. CW2 met with the defendant about cashing checks from his/her accounts with health care fraud proceeds. CW2 told the defendant that CW2 needed to funnel money out of the pharmacy because CW2's business partner and the pharmacy were under investigation. CW2 also

4

explained to the defendant that CW2 needed cash in order to pay patient recruiters and the bank had closed one of the pharmacy's bank accounts due to suspicious activity.

17. CW2 explained that the defendant agreed to cash checks for CW2 in exchange for a five percent fee. CW2 explained that the defendant charged this fee because the defendant knew that CW2's funds came from Medicare fraud. CW2 said that the defendant subsequently increased the fee for cashing the fraudulent checks to eight percent.

18. CW2 explained that the defendant instructed CW2 on the way to convert CW2's fraudulent proceeds into cash through the defendant's check-cashing store. For example, the defendant instructed CW2 to keep the checks below $10,000 and to make the checks payable to different shell companies in the name of nominee owners registered at Convenient to receive the proceeds. CW2 explained that the nominee owners did not physically cash the checks at Convenient. Instead, CW2 relied on a middleman to deliver the fraudulent checks to the defendant. The defendant would give the cash to the middleman who would in return give the cash to CW2.

Healthcare Fraud Laundering – Confidential Witness 3 ("CW3")

19. CW3 is an individual convicted of health care fraud in 2017. CW3 agreed in a factual proffer that CW3 knowingly laundered the proceeds of health care fraud through a check-cashing store using CW3's companies.

20. CW3 explained that, in or around 2012, CW3 was approached by the true owners of two HHA engaged in health care fraud who wanted to cash checks and funnel money out of the HHA bank accounts. CW3 contacted the defendant for guidance, and the defendant instructed CW3 on the way to convert the fraudulent proceeds into cash through the defendant's check-cashing store. For example, the defendant instructed CW3 to use CW3's companies, which were registered at Convenient, as the payee on the checks. The defendant instructed CW3 to keep the

5

majority of the checks below $10,000 and to make only a few checks over $10,000 so that it did not look like CW3 was structuring the checks.

21.     CW3 cashed checks from accounts that received health care fraud proceeds at the defendant's check-cashing store and provided the cash to his/her co-conspirators.

22.     CW3 explained that, at first, CW3 made the checks payable to CW3 in his/her personal capacity. Later, CW3 made the checks payable to nominee owners of companies. CW3 brought in nominee owners to the defendant's store and registered them with the nominee owner's photograph and fingerprints. Subsequently, the defendant cashed health care checks brought by CW3 to the defendant's store made payable to the nominee owners. CW3 cashed checks made out to nominee owners when both had previously left the country to Cuba. CW3 said the defendant charged a six percent fee for cashing these fraudulent checks.

23.     CW3 said, in or around 2013, the defendant asked CW3 if the defendant could use CW3's companies as the payee on checks that were going to be cashed at Convenient. In return, the defendant paid CW3 a fee.

24.     The bank records of Convenient show approximately $843,000 in checks that CW3 cashed at Convenient from 2013 through 2015. The checks were payable to either CW3 or CW3's corporations.

### Defendant Brought Fraudulent Checks to Total

25.     Confidential Witness 4 ("CW4") had operational responsibility for Total starting in or around late 2012. CW4 explained that he/she had trouble earning a profit at the check-cashing store charging a standard fee of one to two percent on checks. CW4 explained that he/she began to look for additional ways to make money and had conversations with Defendant.

26. Defendant told CW4 that Defendant's bank would allow only a certain volume of checks and would not accept checks from health-care related companies. Defendant told CW4 that he would pay CW4 a one to one and half percent fee for cashing these checks and would reimburse any checks that bounced.

27. Beginning at least as early as 2015, Defendant began bringing bundles of large checks to CW4 to cash at Total. Defendant (or his associates) would bring the checks and would arrange to receive the money (minus CW4's fees) later from CW4. Often times, Defendant would send texts to CW4 arranging the drop off of checks or pick up of money such as the following exchanges:

- **Defendant** (September 11, 2015): "dropping the checks off now . . . between tomorrow n Monday 500 [indicating $500,000 in checks]."

- **Defendant** (September 12, 2015): "I just got 80 more now n Monday 300 have a good weekend buddy."

- **Defendant** (September 15, 2015): "I need to pay the 100 today. Needed to that guy 5 days ago."

- **Defendant** (September 15, 2015):L "I need tomorrow 100 cause I can't pick up anything the people r pissed at me causes it's been 2 weeks n I can't keep lying"

28. The United States has obtained records of activity at Total's check-cashing store. Below is a sample of some of ten of the largest checks cashed at Total in 2015. CW4 explained that the checks below came from the Defendant. The below checks are a representative sample and consistent with the types of checks cashed at the store.

| Sample Checks Cashed at Total | | | |
|---|---|---|---|
| Date | Amount | Payor | Payee |
| 10/19/2015 | $96,925.11 | Team Real Estate Title | Andres Figueredo |
| 10/28/2015 | $92,358.05 | Team Real Estate Title | Andres Figueredo |
| 6/30/2015 | $91,000.00 | Andres Figueredo | Andres Figueredo |
| 4/10/2015 | $89,700.00 | Advance Home Care Services | Jorge Martinez |

| Sample Checks Cashed at Total |||| 
|---|---|---|---|
| Date | Amount | Payor | Payee |
| 6/30/2015 | $89,458.21 | Andres Figueredo | Andres Figueredo |
| 3/31/2015 | $89,400.00 | Advance Home Care Services | Jorge Martinez |
| 3/23/2015 | $89,300.00 | Advance Home Care Services | Jorge Martinez |
| 4/23/2015 | $89,300.00 | Advance Home Care Services | Dominga Dorta |
| 10/21/2015 | $88,530.57 | Team Real Estate Title | Andres Figueredo |
| 10/31/2015 | $87,461.12 | Team Real Estate Title | Andres Figueredo |

29. Law enforcement has done an investigation of Advance Home Care Services ("Advance Home"). Based on a review of bank records and witness testimony, the money from Advance Home comes from a health care fraud scheme. Law enforcement contacted patients and doctors for whom Advance Home Care billed services to Medicare. Numerous patients and doctors confirmed that they did not either receive services from or provide services to Advance Home Care. This home health care had approximately $3.4 million in checks cashed at Total in just two months—March and April of 2015.

30. Law enforcement has also done an investigation relating to Team Real Estate Title ("Team Real Estate") and Andres Figueredo. Based on a review of bank records and witness testimony, the money comes from a mortgage fraud scheme. The particular scheme involved obtaining two large loans together totaling approximately $3.7 million for a property in Miami. The organizers of the scheme obtained loans in the name of straw purchasers, set up a fake title company to receive the loan proceeds, and never actually transferred title of the property. The fraud proceeds went in to the account of the fake title company (Team Real Estate) registered in the name of Andres Figueredo. The fraud organizers paid Figueredo approximately $30,000 to sign up for a bank account for Team Real Estate and leave for Cuba.

8

Mortgage Fraud Laundering – Confidential Witness 5 ("CW5")

31. In or around 2015, CW5 met with the defendant at a fish restaurant near Convenient to discuss cashing checks from the Team Real Estate / Figueredo mortgage fraud scheme. CW5 explained that he/she had a negotiation with the defendant and defendant's assistant about cashing fraudulent checks from the scheme for approximately 15 to 20 percent.

32. The bank records of Convenient and Total show checks from this scheme cashed at both stores. Specifically, Convenient cashed approximately $579,000 in checks from the Team Real Estate scheme in 2015. Total cashed approximately $1.2 million in checks from the Team Real Estate scheme as outlined above. CW5 said that he/she only dealt with the defendant with respect to these checks.

33. Both Convenient and Total have the same fake Florida driver's license on file for Andres Figueredo. The driver's license has Figueredo's actual personal identity information, but the picture that does not match the face of Figueredo's actual driver's license photo in the State of Florida records.

34. CW5 explained that an individual posing as Figueredo went to register at Convenient with a fake driver's license. Once that individual registered, the defendant called CW5 to complain that Figueredo looked much younger than the date of birth on Figueredo's license. CW5 explained that there were millions of dollars in checks and that Figueredo was in Cuba and would not be coming back. The defendant told him that it would be OK and agreed to cash these checks in exchange for a fee of approximately fifteen percent. CW5 further stated that he/she only provided checks to and received money from the defendant and the defendant's assistant.

## Conclusion

35. Based on the foregoing, I respectfully submit that there is probable cause to believe that, from 2013 to 2015, the defendant has engaged in violations of Title 18, United States Code, Section 1956(a) (money laundering) and (h) (conspiracy to commit money laundering) and violations of Title 31, United States Code, Section 5234 (structuring transactions to evade reporting requirements).

Further your affiant sayeth naught.

_____
Jose Subias
Special Agent
FBI Criminal Investigation

Subscribed and sworn to before me
On June 22, 2018.

_____
EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE